Mr. Lieberman, I see you reserved three minutes for rebuttal, and you can begin whenever you're ready. Thank you, Your Honors, and good morning. Jeremy Lieberman on behalf of Appellants. Your Honor, plaintiffs submit that the district court committed a reversible error by granting summary judgment on the EpiPen-related claims and denying summary judgment with respect to falsity and materiality for those claims, and also granting summary judgment with respect to the generic drug claims. With respect to the rebate claims, Your Honor, Mylan, during the class period, Your Honors, Mylan, during the class period, made a simple statement in several of its quarterly and annual filings. It said, as a district court paraphrase, if NDA, 23%, if ANDA, 13%. And in the district court's rule and motion to dismiss, it correctly found that was telling the market a simple statement, that if the drug was approved pursuant to an NDA, we would rebate it at 23%. It is undisputed that during the class period, Mylan was an NDA, yet they rebated at 13%. Despite. Let me just ask you before we get to that question. Yes. The district court decided this whole class of claims under Sienta, and they point out in your papers, you can correct me if I'm wrong, that at no point in your papers do you address the fact that the district court, for, you know, I know there were three different challenge statements, I guess, but it's pretty clear the district court found no Sienta, so. I don't see any discussion in the opinion regarding Sienta with respect to that question, rather, if 23%, if NDA, 23%. Well, what was the grounds, then, for the district court's decision on that? District court did not address that series of statements whatsoever. There's no addressing that statement. On page 39 and 38 of the district court's opinion, the first thing it says is, plaintiffs challenge certain statements and communications by Mylan considered together. Mylan at various points made claims that, in fact, if NDA, then 13%, and that's said to be misleading. That's exactly what you just said here. That's a word for word. So, the district court clearly believed it was addressing that claim. It might have believed it, but it doesn't address it in any substance, that particular statement. Excuse me, it missed it. It missed it. It doesn't state in any substance, those statements. Does not address falsely, does not address Sienta whatsoever. And the discussion regarding Sienta. There is a lengthy discussion of Sienta here in the district court opinion. Regarding misclassification, regarding whether or not the company misclassified. The claim is that Mylan committed fraud by failing to disclose that it had engaged in wrongdoing. Right, you're saying? The claim is it should have disclosed that we had engaged in wrongdoing. I don't think so, your honor. No, I mean, the district court describes it as a claim within a claim. And your honor, we respectfully submit that's incorrect. The claim is that Mylan was taking a very strained reading of its obligations under Medicaid rebate. The claim is that Mylan should have disclosed that it was charging the wrong rebate. That's correct.  No, no, no, that it was charging. That's correct or it's not correct? They should have disclosed. But back to what Judge Bianco was asking about. The, what evidence is there of scienter that the defendant knew that they had engaged in wrongdoing or believed that they had engaged in wrongdoing or ignored that they had engaged in wrongdoing and then failed to disclose it? Respectfully, that's not the right, we don't think that's the question. The question is. Well, suppose that's what I'm interested in. What's your answer to that? Well, there were a number of communications with the CMS where the CMS told them in October 29th. There was ongoing discussion with the CMS and it's also starting back in 1997 and at least it was arguable whether this was, it should be 23% or 13%. And that's all that Mylan had to disclose to investors that we're taking a position when we say if NDA 23%, if ANDA 13%, there's an exception we're taking here with respect to EpiPen, our most important drug. On that part of your claim which you're saying even if it was properly classified, they didn't spell it out in the disclosure, right? That's correct, yeah. But there's nothing inaccurate. They explained how the drugs are classified and it's public record. If you look on the CMS website, which I did yesterday, it says N drug and you would know instantly that it's 13%. No, you simply wouldn't know. You look at the disclosures that says if NDA, which it was an NDA and this was an NDA. It doesn't mention EpiPen at all. It just says if NDA this and if ANDA that. EpiPen is its largest product. If they're making that statement, what else would you be referring to but for EpiPen? Particularly when- That would mean nothing to an investor unless they went to the CMS website to begin with to figure out what that means, right? But particularly when it came to, the company was under government investigation during the class period on this very point. At least when they're making these disclosures, they should disclose that the government is investigating them. We have essential- Okay, now you're going to that other part of- Well, but it's all related, particularly regarding Sienta. Allocation part of your case. Yeah. Assuming there was enough evidence based upon the Glazer affidavit that there was some type of market, there's price fixing or allocated market among competitors. The disclosure also said there was not sufficient loss causation evidence. Yeah. So I was curious, in your brief, they point this out. You say on page 58, footnote six, plaintiffs were unable to sufficiently disaggregate the effect of that news from other confounding factors. We're speaking there about the 10 cues that were not alleged as loss disclosure dates. We're not speaking about our corrective disclosures. We're speaking about other corrective disclosures. How do you disaggregate all the other things that were all the other news about the companies across the industry for purposes of loss causation and trigger it to potentially one drug, Doxy, if there was price fixing with respect to Doxy, for example? How could you possibly prove loss causation in a market that has so much news about that type of issue? Well, we were looking at specific dates, Your Honor. And so particularly, for example, when it came to the Bloomberg article on November 3rd, 2016, the company disclosed that there's an increase. Actually, if we look at the October 31, 2017 disclosure, the company discloses for the first time that Malik, the CEO of the company, was engaged in price fixing for Doxy DR. So you have there a specific disclosure. That's the October 31, 2017 disclosure. And the market itself, analysts themselves, commented that they were surprised that the fact that the CEO was involved with this gave greater exposure to the company, subjected to greater scrutiny. What about materiality? The statement they made was, this industry is competitive and price sensitive. So if, in fact, there was some issue with respect to, for example, Doxy, how would we material investor, with respect, I mean, wouldn't you agree that the industry as a whole is competitive and price sensitive? No, we would say with respect to at least 21 drugs, we would say, no. I know, but those 21 drugs are like 4% of genetic revenue. Oh, no, they're 21% of the company's revenues, which we allegedly claim. No, they didn't say anything about the company's revenue. It's about the industry. They're talking about the industry. The statement was, the industry is competitive and price sensitive. But, well, what statement does it, regarding the industry, does that mean to investors, other than- Is that not a true statement? Your Honor, it's not true when it comes to Mylan. That this is a competitive industry? It's not, not when it comes to Mylan. Not when it comes to their generic drugs. In the Goldman Sachs case, Your Honor. The argument is they should have said this would be a competitive industry, but for the fact that we are engaging in all this illegal activity- We're involved in a major conspiracy to fix the prices of drugs. Was that not disputed, whether they were involved in major conspiracies? Well, they're- Again, you could say, where's the center on not disclosing that they were involved in these major conspiracies? They were certainly challenging whether they were violating the law. You have a scenario where the company and the company's executives, prior to new entrants coming to the market are having numerous phone conversations with their competitors and discussing, particularly we have evidence regarding the Doxy case, discussing the allocation of markets. And we have a Fifth Amendment pleas where we ask specific questions on these issues. So the inferences with respect to those pleas was that the answer would have been disfavorable to the company, and disfavorable to the opponent, where we ask specific questions regarding those conversations and the contents of the conversation, and all those dealt with dozens of drugs. And so the question is, we don't just allege one drug, Doxy DR. We have reams of evidence. We have a plea agreement by Sandoz on Benazeprol, where Sandoz pled guilty. That's a drug where we have emails and we have discussions, we have Fifth Amendment pleas on that very drug. So we have much more here than just Doxy DR. But I would submit, Your Honor, when even coming to Doxy DR, the CEO of a company is colluding to fixed prices. He's the president, right? He was the CEO at the time of the Glazer affidavit. So the CEO of a company is colluding to fixed prices, which is such drastic behavior. We think on its own that's material, Your Honor. All right, thank you, Mr. Wheaton. You have your three minutes in rebuttal. We'll hear from Mr. Marion. Thank you, Your Honors. May it please the Court, David Marriott for defendants. Judge Etkin presided over this case for about six and a half years. He permitted three rounds of motions, three rounds of pleadings, allowed extensive discovery, fact, and expert, and entertained extraordinary summary judgment papers in excess of 3,500 words when you count briefs  In addition to that, Judge Etkin was able to provide And respectfully, Your Honors, we believe he got it right when he dismissed the claims that are asserted here. With respect to the MDRP claims, plaintiff's claims failed for three reasons. Lack of scienter, lack of an ability to show a misleading statement or omission, and lack of loss causation. And with respect to scienter, as we say in our papers, plaintiffs failed here to challenge the District Court scienter rulings, which are independently dispositive. Your Honor, Judge Bianco pointed counsel to the page of the court's decision where the judge discusses scienter. Not only at page 38 does he specifically reference the claim to which counsel referred, but then at page 39 he specifically refers using the word scienter to scienter and finds a lack of scienter. But to be fair, most of the analysis focuses on this idea that they didn't have scienter to misclassify, whereas he's saying part of their argument was even if they did not misclassify, they didn't properly disclose to the investors what the percentage was. I think to be fair, Your Honor, most of the analysis does focus on classification, but nonetheless, the analysis does address the question of whether or not the rebate rate itself was a problem. What I would say to the court is, in having, the court found below there was no scienter as to the classification issue. In the absence of scienter as to the classification issue, it necessarily follows there's not gonna be scienter as to the rebate rate. The rate itself is a function of the classification. So if a company reasonably classified the EpiPen as an end drug, the classification rate naturally follows as a matter of statute as to what it is. They're saying they misled the investors whether it was 13 or 23, even if it was properly classified. That is in fact what they're saying, Your Honor, and we would respectfully submit that even if you assume Judge Etkin didn't get to it, there's no evidence here that the company knowingly, willfully misled shareholders. Can I ask you about the market allocation part of this? Sure. I mean, you do have, it's pretty unusual when you're saying where's the evidence of the market allocation. They in fact have a CEO of a company who says I had multiple phone calls with the CEO of Mylon and discussed that they wanted to have CVS, right, and McKesson, they wanted to have those accounts and that he interpreted their back and forth. I know you have a different interpretation of what it means to play fair, but we have to construe that evidence most favorably to them and he interpreted it and the results of that conversation, they say, demonstrates that that was an effort to get those customers to Heritage. So why isn't it, I know it's just one drug, but why wouldn't that be enough to show that at least with respect to that drug, there was some type of market allocation or price fix? It wouldn't be enough, Your Honor, because I think you have to look at the Glazier affidavit in its totality and what Mr. Glazier says is that in fact the Mylon person with whom he claims he spoke was non-committal. Those are his words, non-committal. And that I would submit to the court is the very antithesis of an agreement which is necessary for there to be a violation. Anyway, someone says I'll get back to you on that. We're gonna play fair, I'll get back to you on that. I'll talk to my team, I forget what he says. And then in fact, the result they say is CVS described a bid from your client is not in the ballpark and they did get those accounts. So again, I understand it's not, there's obviously a different way to look at the whole situation and you're pointing to that, but I don't know that you could say if construing it was favorable to them that that wasn't, the reasonable inference wasn't that they in fact put in a little bid because of those phone calls. You know, I would respectfully submit that you can because they describe it as the smoking gun and I think if it's a gun at all, it's a gun that shot blanks. It's a gun that specifically says they were non-committal and elsewhere in the affidavit, Mr. Glazier refers to there having been price fixing. If you look at the record here, what in fact happened is that Mylon, subsequent to these conversations, had a heritage bid and the prices for Doxie DR went down. So if it was an agreement to supposedly fix prices, it was a very poor agreement and it wasn't that at all, Your Honor, but it certainly is not borne out by the other circumstantial evidence that exists here and if it was in fact an agreement, it would have made no sense for Mylon to, for the heritage bid to be 25% less than what the Mylon bid was. That would have been a completely irrational conspiracy as it related to supposedly allocating markets. All right. You wanna address the loss causation materialities relates to that? I do, Your Honor. I'd love to address that because I think that's entirely independently dispositive of these issues, irrespective of what the court finds with respect to Glazier of Fifth Amendment pleas. Judge Etkin found an absence of loss causation for two independent reasons. First was a failure to disaggregate and second was a failure to tie the alleged triggers to the alleged misstatements and with respect to disaggregation respectfully, I don't believe the plaintiff's opening brief really adequately addresses Judge Etkin's findings. I think they've effectively not addressed key disaggregation points, but in any case, I don't think there's much to output that they didn't disaggregate. Let me focus the court on the actual alleged corrective disclosures. There are in fact four of them and they're effectively falling to two sets. The first of them concerns a statement by then President-elect Trump that the pharmaceutical industry needed to be fixed, that there needed to be new bidding procedures. The Trump statement, the then President-elect Trump statement was not specific to the generic marketplace. It was not specific to Mylon and it was not specific to the drug supposedly the subject of collusion here. It didn't correct anything, your honors, that Mylon is purported to have said and nor was it a materialization of an undisclosed risk. It concerned no new regulatory information at all. Mr. Trump and others had long been critical of the pharmaceutical industry. They had long called for regulatory reform and importantly here, the plaintiffs make no effort whatever in their papers to disaggregate the effect of Mr. Trump's statement on the drugs that are not at issue here. Mr. Trump broadly called, your honors, for a fixing of bidding procedures in the pharmaceutical industry. He wasn't talking about generics and he certainly wasn't talking about the drugs here and there's no effort whatever to disaggregate. So that's the Mr. Trump statement. There are three other statements, all of which are very similar in kind. They all relate to- One that they point, Mr. Wigman mentioned today, I think, he picked what I think is their best argument for disaggregation which is the Connecticut Attorney General on October 31st filed an amended complaint that for the first time implicated Mr. Malik in connection with the Doxy scheme. So why wouldn't that one potentially- Well, it's important, I think, to distinguish between Malik on the one hand and a different myelin person whose name is spelled similarly but different. So Malik is the MCURE heritage person. Malik is the myelin person. In any case, your honor, it is true that the disclosures made some mention of Mr. Malik at a certain point in time but it had previously been disclosed by the attorneys general when they filed their initial lawsuit, your honor, that they were, in their words, in the attorney general's words, this was the tip of the iceberg and supposedly a senior myelin person was to be implicated in these allegations. So there was absolutely nothing new by the time of this supposedly corrective disclosure. What you've gotta have, your honor, for there to be loss causation is you've gotta have a disclosure that corrects something that was done. The disclosures that counsel folks on here don't even specifically mention myelin. They correct nothing about myelin, nothing about its revenues, right? There's no admission in them about myelin having done something wrong. And there was no materialization of an undisclosed risk because the risk to which counsel refers is a risk that had already been disclosed. It was a risk that was disclosed when the attorneys general, within the class period, filed their original complaint and then the attorney general touted to the world that this is the tip of the iceberg, others are involved. Bloomberg repeated the same things, your honor. Myelin itself disclosed the fact of these investigations. Exhibit 32, exhibit 644, exhibit 645, exhibit 646. There's just no question that the risk that's supposedly at issue was out there and it was known to the world. So there was no effort to disaggregate and there's just no materialization of an undisclosed risk. The risks were there. And for that reason alone, your honor, entirely independent of the other issues, respectfully, we submit Judge Etkin got it right. And what about materiality? In terms of, you have a separate argument that the statement that the industry is competitive and price sensitive, that's... Yeah, for materiality, your honor, you have to have a substantial likelihood. So substantial likelihood that a reasonable investor would have found the supposedly undisclosed information would significantly alter the total mix of information. That's the test under Basic versus Levinson. And the supposed adding of the name of a particular person when it had previously been disclosed that one or more senior executives were supposedly involved adds absolutely nothing to the mix. I was talking about more generally the argument that whatever was going on with respect to some subclass of drugs would not be material to a statement that's as broad as the industry's competitive and price sensitive. Thank you, your honor, I apologize. I think there's no question that the challenge statements here were not material. I would point the court just by way of example, Exhibit 42, the 2016 10K of the company, which discloses within the class period and before the supposedly collected disclosures for the most part, of the things that they contend are anti-competitive. Disclosures of government investigations and pricing practices, assertions of wrongdoing, a potential reputational harm, federal prosecutors recently issuing subpoenas, a late 2015 House of Representatives report. I don't think there's any question, but that the pharmaceutical industry was and always has been extraordinarily competitive. And if you look more fully at the statement that is cited by counsel, and I see my time is up, your honor, but just to complete the question, the answer to the question, this is at page A122 of the record. The statement is not just about price. The statement is about manufacturing of product quality and marketing and portfolio offering size. The industry is competitive along a whole line number of dimensions. Your honor, I see my time is up unless there are further questions. Thank you for the court's attention. Thank you. Thank you, your honor. Your honor, with respect to the materiality, there weren't only statements regarding the market being. Sure. Not that I don't want to give you extra time. Appreciate that. Thank you. Okay, your honor, with respect to materiality, the alleged misstatements weren't just the competitiveness of the market, which this court in Goldman Sachs held could be a specific non-generic statement, particularly here where there's a major exception to that in our view. You have also statements stating the reasons for their success, the reasons for their increased gross margins, and our expert shows that the gross margins for these 21 drugs increased by 470%. So the company's talking about why their margins are getting better, but they're failing to disclose that it's a result of a scheme. As to, there's some inference to focus only on Doxie DR. The Second Circuit has said that if you allege and prove a structural change in pricing during your alleged wrongdoing period, you have then, you can show then antitrust claim on Sherman Act claim on its own. And here we have the 14th. You're not pursuing that part of your case. This is a disclosure claim, right? This is a disclosure claim. It's not whether you can prove antitrust violations, whether or not a disclosure where the challenge statement is that this is a competitive industry. Yeah, and we're showing it's well beyond, the point is it's well beyond just Doxie DR. You have price fixed drugs here that are going up by thousands of percent, which are impacting margins by significant amounts. It's 20% of the company's revenues. So they're talking about their revenues, they're talking about their sources of income. It is a significant question whether you've proven that this type of allocation occurred across all of the drugs. Well, it is a question, but we show, we have Fifth Amendment pleas. We have multiple, we have other competitors in the industry. We have four co-conspirators. What should the statement have been if there had been proper disclosure? The reasons for our increased gross margins was a result of price fixing, including. An admission that it had engaged in price fixing. Well, not an admission that it engaged in legal behavior per se, but an admission that we've got together with our co-competitors, we allocate markets, and we've agreed to fix prices. Because we have your Fifth Amendment pleas on each and every drug. And those, for purposes of summary judgment, this court has said we should get that adverse inference. And so all this is. What's your response to Mr. Marid's argument that if they were fixing the prices of Doxie that 25%, your client wouldn't bid 25% lower than Mylan? What's your response to that? That Heritage wouldn't bid? Yeah, why would they bid if they were, if they give the fat one, why would your client's bid have been so low? Because they know that Mylan's gonna give a cover bid that's higher. So that's already discussed. When you allocate a market, you also talk about price. So you know what your price is gonna be. If you're price fixing, you would just put your price a little bit lower than theirs. 25% lower. I don't think there's an inference to be drawn from that. It could be that the price was, there's nothing on the record saying that even 75% would have been appropriate. There's nothing saying that 25% was a competitive price. There's nothing on the record whatsoever. What is on the record is that Malik pled guilty, excuse me, Glaser pled guilty to conspiring to fix drugs with Malik. And there are phone conversations showing that. And McKesson and CVS ultimately were won by Heritage.  And the record shows also is that the CEO, and that was disclosed to the market, that analysts were upset that the CEO was involved because it showed greater scrutiny to the company. And... All right, thank you. Thank you very much, Mr. Weidman. Thank you, Mr. Marriott.  Have a good day. Thank you.